Filed 3/30/21; certified for publication 4/27/21 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, <br><br>   Plaintiff and Respondent, <br><br>      v. <br><br>TRAMPAS MICHAEL OREY, <br><br>   Defendant and Appellant. | G058040 <br><br> (Super. Ct. No. M-13340) <br><br> O P I N I O N |

        Appeal from a judgment of the Superior Court of Orange County, Jeannie M. Joseph, Judge. Affirmed.

        Christian C. Buckley, under appointment by the Court of Appeal, for Defendant and Appellant.

        Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Michael Pulos, Seth Friedman and Joy Utomi, Deputy Attorneys General, for Plaintiff and Respondent.

*       *       *

## INTRODUCTION

A jury found Trampas Michael Orey to be a sexually violent predator pursuant to the Sexually Violent Predator Act, Welfare and Institutions Code section 6600 et seq. (SVPA) (undesignated code sections are to the Welfare and Institutions Code). The trial court ordered him committed to the California Department of State Hospitals (DSH) for an indeterminate term. Orey appeals from the order of commitment.

We affirm. We conclude: (1) Any error in admitting into evidence two photographs of victims was harmless; (2) The trial court did not err by admitting into evidence prison records and Coalinga State Hospital records reflecting statements concerning or attributed to Orey; (3) substantial evidence supports the order of commitment; (4) the trial court did not err by denying Orey's motions, made pursuant to *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*), for the discharge of his appointed counsel and for the appointment of other counsel to represent him; (5) the trial court did not err by denying Orey's request to give a special instruction on the issues of "volitional impairment" and "serious difficulty controlling sexually violent behavior"; (6) the SVPA does not violate equal protection, due process, the prohibition on ex post facto laws, and double jeopardy under either the federal or state constitution; and (7) there was no cumulative error.

## SVPA STATUTORY FRAMEWORK

The SVPA authorizes the state to civilly commit persons found to be sexually violent predators after they conclude their prison terms. (*Reilly v. Superior Court* (2013) 57 Cal.4th 641, 646-647.) Section 6600, subdivision (a)(1) defines a sexually violent predator as "a person who has been convicted of a sexually violent offense against one or more victims and who has a diagnosed mental disorder that makes the person a danger to the health and safety of others in that it is likely that he or she will engage in sexually violent criminal behavior."

2

The Welfare and Institutions Code provides an outline of the procedure for determining whether a person is a sexually violent predator. (§ 6600 et seq.) When the Secretary of the Department of Corrections and Rehabilitation determines that a person in custody may be a sexually violent predator, the secretary refers that person for an initial screening. (§ 6601, subds. (a)(1), (b).) "If as a result of this screening it is determined that the person is likely to be a sexually violent predator, the Department of Corrections and Rehabilitation shall refer that person to the [DSH] for a full evaluation." (§ 6601, subd. (b).)

The full evaluation is conducted by two mental health experts, either psychologists or psychiatrists, designated by the Director of the DSH (the Director). (§ 6601, subd. (d).) Each mental health expert must evaluate the person in accordance with a standardized assessment protocol "to determine whether the person is a sexually violent predator as defined in [section 6600]." (§ 6601, subds. (c), (d).)

"If both evaluators concur that the person has a diagnosed mental disorder so that he or she is likely to engage in acts of sexual violence without appropriate treatment and custody, the [Director] shall forward a request for a petition for commitment under Section 6602." (§ 6601, subd. (d).)[1] The attorney petitioning for commitment may request updated evaluations if it is determined they "are necessary in order to properly present the case for commitment" and may request replacement evaluations "[i]f one or more of the original evaluators is no longer available to testify." (§ 6603, subd. (d)(1).)

Once a petition for commitment has been filed in the superior court, the court holds a hearing to determine whether there is probable cause to believe the person

_____

[1] If the evaluators disagree on whether the person is a sexually violent predator, then the Director "shall arrange for further examination of the person by two independent professionals." (§ 6601, subd. (e).) The petition "shall only be filed if both independent professionals who evaluate the person pursuant to subdivision (e) concur that the person meets the criteria for commitment specified in subdivision (d)." (§ 6601, subd. (f).)

3

named in the petition is likely to engage in sexually violent predatory criminal behavior upon release. (§ 6602, subd. (a).) If the court finds probable cause, then the court orders a trial to determine whether the person is a sexually violent predator under section 6600. (§ 6602, subd. (a).)

Although a trial under the SVPA is civil in nature, the person being tried is guaranteed several rights accorded defendants in criminal trials. (*Reilly v. Superior Court, supra*, 57 Cal.4th at p. 648.) These rights include the right to a jury trial (§ 6603, subd. (a)), the right to assistance of counsel (*ibid.*), and the right to a unanimous jury finding the person being tried is, beyond a reasonable doubt, a sexually violent predator before he or she may be committed (§ 6604). (*Reilly v. Superior Court, supra*, at p. 648.)

In an SVPA trial, the People must prove three elements beyond a reasonable doubt: (1) the person being tried has been convicted of at least one sexually violent offense as defined in section 6600, subdivision (b); (2) the person has "a diagnosed mental disorder that makes the person a danger to the health and safety of others" (§ 6600, subd. (a)(1)); and (3) the diagnosed mental disorder means in the future "it is likely the person will engage in sexually violent criminal behavior" (*ibid.*). (*People v. Yates* (2018) 25 Cal.App.5th 474, 477 (*Yates*).)

If the court or jury finds the person is a sexually violent predator, then he or she is committed for an indeterminate term to the custody of the DSH. (§ 6604.) Following commitment, the sexually violent predator is subject to annual mental examinations to determine whether he or she continues to meet the definition of a sexually violent predator. (§ 6604.9, subds. (a), (b).)

In accordance with these provisions, the Orange County District Attorney in May 2011 filed a petition to commit Orey as a sexually violent predator. In August 2014, the trial court found probable cause following a two-day hearing. In July 2019, following trial, the jury found it to be true that Orey was a sexually violent predator, and

4

the trial court issued an order committing him to DSH custody for appropriate treatment and confinement for an indeterminate term.

## FACTS

### I.

### Qualifying Offenses

Orey was born in June 1975. He has been incarcerated or confined to the Coalinga State Hospital since July 2001. The parties stipulated that Orey had been convicted of the following qualifying offenses within the meaning of section 6600, subdivisions (a)(2) and (b):

1. In 1995, Orey was convicted of one count of annoying or molesting a child under 18 years of age (victim C.A.) in violation of Penal Code section 647.6. He was sentenced to 270 days in jail.

2. In 2000, Orey was convicted of one count of annoying or molesting a child under 18 years of age (victim E.M.), with a prior conviction, in violation of Penal Code section 647.6, and peeking (victim E.M.) in violation of Penal Code section 647, subdivision (i). He was sentenced to 365 days in jail and probation for five years.

3. In 2002, Orey was convicted of two counts of kidnapping for child molesting (victims El.B. and E.B.) in violation of Penal Code section 207, subdivision (b), three counts of annoying or molesting a child after entering an inhabited dwelling (victims El.B., E.B., and J.L.) in violation of Penal Code section 647.6, subdivision (b), and one count of first degree burglary of an inhabited dwelling in violation of Penal Code sections 459 and 460. Orey was sentenced to a prison term of 11 years four months.

### II.

### Victim Testimony

Three victims—C.A., J.L., and El.B.—testified at trial. C.A., who was 33 years old at the time of trial, testified about an incident involving Orey in 1995, when she was nine years old. As C.A. was watching fireworks while standing outside of her

5

apartment complex on July 3, she noticed Orey "lingering around" the area. Orey approached her from behind, reached between her legs, and, over her clothing, grabbed or squeezed her vagina. He then forced her to the ground and tried to kiss her. C.A. struggled, kicked Orey in the chest, and ran way. As C.A. was running, Orey yelled, "no, come back, I was just kidding." C.A.'s mother contacted the police.

Several months later, C.A. saw Orey near her school. Both were riding bicycles. Orey followed C.A. She rode home and told her mother, "I saw him again" and "he was chasing me." C.A. saw Orey again several days later.

J.L., who was 27 years old at the time of trial, testified about an incident involving Orey in 2001, when she was nine years old. J.L. lived at an apartment complex that did not allow children to use its swimming pool without an adult present to supervise. J.L.'s parents were not home on July 2, 2001, so when her brother announced there was a man outside the apartment who was willing to supervise them, she put on her swimsuit and went with her brother to the pool. While J.L. was swimming, Orey got in the pool, followed her, and began touching her. He was mainly touching her legs but at some point touched her buttocks and bit her. J.L. asked Orey to stop and tried to swim away from him, but he followed her and persisted in touching her. J.L. got out of the pool and started walking back to her apartment. Orey followed her. She asked him where he was going; he replied that he needed to use the restroom. She told him there was a restroom by the pool; he claimed it had no toilet paper.

Orey followed J.L. to her apartment and stood in the doorway. J.L. gave him some toilet paper and told him that her dad was home. Orey left. J.L. shut the door and locked it. She reported the incident to the police.

El.B., who was 26 years old at the time of trial, testified about another incident on July 2, 2001 at the same apartment complex pool. At that time, she and her twin sister, E.B. were eight years old. On July 2, Orey approached El.B. and E.B. and asked if they wanted to go to a "secret place" with him. El.B. thought it would be safe to

6

play with Orey because she had seen him in the pool with J.L. Orey had El.B. and E.B. follow him to the apartment complex's laundry room. After taking other people's clothing, he said, "let's go to your room, I know where your room is at." Orey, El.B., and E.B. walked to the girls' apartment. Nobody was home. They went into the bedroom. Orey asked El.B. and E.B. to change their underwear in front of him. When El.B. and E.B. balked, Orey said, "okay, I'll go first," removed his trousers, and put on children's underpants over his boxer shorts. E.B. announced that her mother was coming home. Orey ran out of the apartment and back to the pool area, where police officers were waiting for him.

Suspicious items had been found in Orey's car on December 21, 1999 in a search attendant to a traffic stop. Police officers searched Orey's car and found some residual marijuana, a teddy bear, a photograph of a teenage girl, and a drawing of a preteen girl with her top pulled down and her dress pulled up. In the trunk, the officers found lotion, a Polaroid camera, a pair of children's sunglasses, a child's comb, three pairs of little girl's underwear, and two or three girl's tops. Orey told the officers the teddy bear did not belong to any child he knew, and he declined to say why he had it. Orey said he had taken the clothes from the laundry room at an apartment complex about four months earlier.

During the traffic stop, Orey told one of the officers that he was "struggling" with "fantasies about young girls who were around the age of seven." He said he had attended counseling but was no longer doing so.

### III.

### Conduct and Statements Made While in Prison and at Coalinga State Hospital

Following his conviction in 2002, Orey was incarcerated in state prison. In May 2011, near the end of his sentence, the Orange County District Attorney filed the

petition to commit Orey as a sexually violent predator pursuant.  In August 2011, Orey was transferred to Coalinga State Hospital, where he has remained ever since.

In October 2002, Orey told prison mental health staff that he was dreaming of having sex with young children.  In May 2003, he told prison staff that he was having ongoing urges and fantasies regarding sexual behavior towards young children and that he wanted to get help.  In March 2005, Orey acknowledged that that he was terrified that he would reoffend, was plagued by sexual fantasies of molesting children, and was terrified of hurting another child.

In April 2005, Orey acknowledged to prison staff that he felt out of control of his own sexual behavior and in August 2006 acknowledged to prison staff that he had ongoing thoughts regarding young children.  He expressed concern that he was never going to be allowed to live a free life in society.  In 2008, he reported that his mother had once caught him trying to cut off his own penis.

## IV.

### Treatment History

The parties stipulated to the following regarding Orey's treatment history:

On December 21, 2009, Reverend Diogo Bautista, Roman Catholic chaplain, signed a prison record stating that Orey had "actively participated in the Criminals and Gang Members Anonymous or CJA victims workshop, a four-week workshop dealing with the impact of sex crimes on victims, societies and families, what fuels the victimization of others, collateral damage of an individual's crime, as well as forgiveness and the healing process.  The workshop was from June 30th, 2009 through July 11th, 2009.  Mr. Orey attended two of four meetings."

On December 21, 2009, Bautista signed a prison record stating that Orey had "attended 10 out of 15 meetings of Criminals and Gang Members Anonymous or CJA, a 12-step self-help program for men convicted of sex crimes that met once a week for one hour."  On October 25, 2010, Bautista signed a prison record stating that Orey

8

"had completed the first phase [six month phase] of the 12-step Recovery Methodology of Spiritual Transformation to Overcome Destructive Addictive Traits and Character."

In October 2011, Orey enrolled in the Coalinga State Hospital's sex offender treatment program and fully participated in sex offender treatment and in treatment team meetings from October 2011 until June 2012. In the spring of 2012, Orey was enrolled in Phase II sex offender treatment program but in June 2012 he chose to stop participating in sex offender treatment.[2] Since June 2012, Orey has declined sex offender treatment at Coalinga State Hospital and stopped participating in treatment team meetings. His treatment team has continued to encourage him to resume participation in the sex offender treatment program and has made treatment available to him.

## V.

## Testimony of SVPA Evaluators

At trial, the prosecution offered testimony from two psychologists who had conducted sexually violent predator evaluations of Orey: Mark Patterson, Ph.D., and Jay Malhotra, Ph.D.

A. *Patterson's Testimony*

In 2011, Patterson, a contract psychologist for the DSH, conducted the initial SVPA evaluation of Orey. Patterson prepared updated evaluations of Orey in 2013, 2016, 2017, and 2018.

Patterson testified that, in his opinion, Orey had several qualifying mental disorders, namely, pedophilic disorder, fetishistic disorder, antisocial personality disorder, and a number of substance abuse disorders. Patterson explained that pedophilic disorder is the presence of a strong sexual interest in prepubescent children occurring over the course of at least six months and which causes distress or social and psychological impairment. Patterson testified that pedophilic disorder tends to be a

---

[2] Phase I is an overview of the treatment program; Phase II is the actual start of treatment.

chronic, lifelong condition. Fetishistic disorder is a condition in which a person is strongly aroused by and responds to nonliving things, for example, underwear.

In reaching his conclusions, Patterson relied upon his interview with Orey in 2011, the details of his criminal offenses, criminal reports and court records of his qualifying offenses, Coalinga State Hospital records, and Orey's conduct documented in police reports, prison records, and hospital treatment notes.

Patterson interviewed Orey for about two and a half hours for the 2011 evaluation; however, Orey declined to meet with Patterson for the updated evaluations. Orey admitted during the 2011 interview that he had committed the qualifying sexual offenses. He said he had been using LSD when he grabbed C.A. in 1995. He admitted he had tried to coax El.B. and E.B. to take off their clothing because he wanted to orally copulate them. He also admitted that he had taken a pair of the girls' underwear with him and that he would steal girls underwear from the apartment complex laundry room so he could masturbate into them. He told Patterson, "I knew it was wrong what I did."

Orey committed the offenses against E.M. during a period of time in which he had been engaging in voyeuristic behavior. He was on methamphetamine and, while prowling around an apartment complex looking for something to steal, he looked through a window and spied on a girl taking a shower. He thought she was three years old. When the girl saw Orey, she screamed, and a neighborhood watch member caught him.

Orey blamed himself for his sexual offenses. He acted on the spur of the moment and could not stop himself from doing things he knew were wrong. Orey had been lonely and committing the offenses was "a high" and "a rush" for him.

Orey told Patterson that about 10 percent of the time while masturbating he would have fantasies about prepubescent girls and would try to stop the fantasies by picturing more adult women. Orey said he was sexually interested in children and could become aroused by seeing images of children in magazines or on television. At the time of the interview, Orey's sexual fantasies about prepubescent children were "ongoing."

He preferred girls under the age of 10, in particular, girls age 6 or 7, and liked to masturbate with girls underwear. When asked to identify sexual "triggers," Orey replied, "young girls wearing tight clothes."

During the interview, Orey said he had started masturbating when he was 12 and his first sexual encounter was at age 13 when a seven-year old girl jumped on his lap and aroused him. Orey said had about four adult sexual partners. When he was 18, he had a girlfriend of the same age, and they had been sexually active. When Orey was 21, he had a sexual encounter with a 15-year-old girl.

Orey had started drinking when he was five or six years old, started smoking marijuana when he was 12 or 13, and used LSD, methamphetamine, cocaine, and "psilocybin mushrooms." He ran away from home at one point and was arrested for shoplifting when he was 15 or 16. He described himself as a loner and a risk taker. He got into a lot of fights at school before he dropped out in the tenth grade, had worked a variety of jobs, and by age 18 or 20 was selling drugs to support himself.

Orey said he would benefit from sex offender treatment: He did not want to reoffend, felt badly about what he had done, and had never meant to hurt anyone. Orey told Patterson that he "would be doing treatment." But since 2012, Orey had avoided all forms of treatment and had not attended team meetings.

Patterson considered Orey's statements and conduct recorded in prison records and Coalinga State Hospital records, which are described in part III of this section and part II of the Discussion section. Patterson considered it to be significant that while in prison Orey had committed several serious rules violations, two of which were for fighting or aggressive behavior. While Orey has been at Coalinga State Hospital, he has had angry outbursts and defied the rules. Patterson believed that Orey's inability to control his aggressive behavior and sexual interest in children impaired his emotional and volitional capacity. Patterson concluded that Orey has "demonstrated that he has not been able to manage his behavior . . . despite treatment and despite punishment."

11

Patterson evaluated Orey using four actuarial instruments designed to assess risk factors associated with sexual reoffending. Orey's score of six on the Static-99R instrument placed him in the highest risk group of offenders—those who offended at a rate of 25 percent after five years and 37 percent after 10 years. Orey's score of eight on the Static-2002R placed him in the highest group of offenders. Orey scored in the moderately high-risk group on the Sex Offender Risk Appraisal Guide (SORAG) and the Violence Risk Appraisal Guide Revised (VRAG), which predict criminally violent reoffending, including sexual reoffending. Patterson believed such actuarial assessments generally underestimate sexual offense recidivism because many sexual offenses go unreported. Patterson determined that Orey had no "protective factors" (such as advanced age) that might reduce the level of risk, in particular, Patterson found it to be significant that Orey had refused treatment at Coalinga State Hospital.

Patterson opined that Orey, as a result of his diagnosed disorders, was a danger to the health and safety of others because it is likely he will engage in sexually violent criminal behavior. Patterson concluded that it would be necessary to keep Orey in a secure facility to ensure the safety of others. Patterson's opinion had not changed since 2011.

B. *Malhotra's Testimony*

Malhotra, a contract psychologist for the DSH, conducted an evaluation of Orey in 2018. In conducting the evaluation, Malhotra reviewed Orey's criminal, state hospital, and prison records, and the prior reports prepared by Patterson. Malhotra placed a telephone call to Coalinga State Hospital to interview Orey. The call was answered by a staff member, who tried to get Orey to speak with Malhotra, but Orey would not come to the phone.

Malhotra diagnosed Orey as having pedophilic disorder, fetishistic disorder, and a number of substance abuse disorders. Malhotra testified that pedophilia is "generally thought of as a lifelong condition" but pedophilia is different than pedophilic

12

disorder, "which involves implementing those pedophilic urges and fantasies into behaviors." Malhotra testified that all of these disorders were qualifying disorders under the SVPA and the substance abuse disorders impaired Orey's ability to control his pedophilic and fetishistic desires. Orey's history of acting out impulsively and his inability to control his actions were connected to and made worse by his substance abuse disorders.

Malhotra testified that Orey had pedophilic disorder because he had acted on his urges and fantasies by molesting children in 1995, 1999, and 2001. Orey had fetishistic disorder because in 2001 he had become aroused by a child's panties. Malhotra concluded: "[Orey] has indulged in pedophilic behavior, he's indulged in fetishistic behavior and so that's the basis of the diagnosis."

Malhotra assessed Orey's risk of reoffending by using the Static-99 instrument. Malhotra, like Patterson, gave Orey a score of six, the highest risk category. Malhotra found that Orey has all five dynamic risk factors found to have significant value in predicting risk—significant social influences, intimacy deficits, general self-regulation, sexual self-regulation, and lack of cooperation with supervision. Malhotra noted that Orey had not accepted any treatment while at Coalinga State Hospital and described him as "generally anti-treatment."

Malhotra concluded that, as a result of Orey's diagnosed mental disorders, Orey posed a danger to the health and safety of others and it is likely he will engage in sexually violent predatory criminal behavior. Malhotra also concluded it is necessary to keep Orey in a secure facility to ensure the health and safety of others.

## VI.

### Testimony of Defense Experts

Two clinical psychologists—Brian Abbot, Ph.D., and Christopher Fisher, Ph.D.—testified on Orey's behalf.

13

A. *Abbot's Testimony*

Abbot, who had conducted about 500 sexually violent predator evaluations in his career, reviewed the evaluations prepared by Patterson and Malhotra "to determine whether the information they provided in their reports was sufficient to justify their findings that Mr. Orey meets the criteria as a sexually violent predator." Abbot did not interview Orey, review his records, or evaluate whether he is a sexually violent predator.

Abbott reached the conclusion that, with the exception of the existence of qualifying offenses, Patterson's evaluation and Malhotra's evaluation provided insufficient information to support a finding that Orey met the criteria for commitment as a sexually violent predator. The basis for this opinion was that neither Patterson's evaluation nor Malhotra's evaluation presented any evidence of a current or recent desire for prepubescent girls. Abbott testified that Patterson's evaluation and Malhotra's evaluation recited only Orey's criminal history without "presenting any current symptoms" of the diagnoses. Abbott believed it was improper to base a diagnosis on convictions or criminal acts that had occurred long before the current period at issue.

Abbott testified there was no substantial research to support a conclusion that pedophilia is a lifelong disorder. He believed that pedophilia could qualify as a current pedophilic disorder only if the person was currently acting on it; a person who suffered from pedophilic disorder at one point in life would not necessarily continue to suffer from the disorder for the rest of his or her life. Abbott opined that Patterson and Malhotra had incorrectly diagnosed Orey with pedophilic disorder because, since 2011, there had been no evidence of any current arousal or other institutional signs of pedophilic thoughts and actions.

Abbott also testified that Patterson's evaluation and Malhotra's evaluation presented no evidence that Orey was having any current difficulty controlling his behavior: The mere existence of more than one diagnosis and Orey's history were insufficient to

14

support those opinions. According to Abbott, Orey had shown no objective indications of difficulty controlling his behavior.

B. *Fisher's Testimony*

Fisher testified that he was asked to determine whether Orey meets the commitment criteria as a sexually violent predator. Fisher reviewed the state sexually violent predator evaluations for Orey, his police reports, prison and hospital records (including disciplinary reports), treatment plans and records, and release plan. Fisher interviewed Orey for three and a half hours in 2019.

Fisher testified that Orey's records showed that he had been a "mess" until approximately 2005, when his condition and mental state changed. Before 2005, Orey had not faced his pedophilic disorder, had rationalized his actions, and both physically and mentally had indulged his improper interest in children. By 2006 or 2007, Orey had begun to stabilize emotionally and, by 2009, had begun to seek treatment. Between 2009 and 2011 Orey attended regular treatment groups and indicated a desire to participate in any available sex offender treatment. Once Orey was at Coalinga State Hospital, he continued his focus on treatment: He completed Phase I of the then existing treatment and started Phase II in 2012, when the hospital changed its program. Orey and other committed sexually violent predators believed the new treatment program did not give them credit for their past work and forced them to start over.

Fisher testified the new treatment program at Coalinga State Hospital was inconsistent in that treatment providers were being shifted around with no notice. Staff turnover made it difficult for patients to form any significant trust and relationship with the staff. Fisher believed the combination of programs Orey had completed while in prison and at Coalinga State Hospital constituted "focused treatment" for his disorders. Fisher acknowledged that Orey had refused a treatment program available at Coalinga State Hospital but believed that his commitment to treatment was genuine and that he would remain committed to some form of appropriate treatment if released.

15

Fisher diagnosed Orey with historic pedophilic and fetishistic disorders and concluded those disorders were not causing him serious difficulty controlling his sexual behavior as of the time of the trial. Those diagnoses, though accurate based on Orey's past actions and admissions, did not qualify Orey for commitment as a sexually violent predator because he had shown no behavioral control issues and had not taken any actions to suggest he was still trying to satisfy improper urges.

Fisher testified that recent studies support the conclusion that pedophilia is not a lifelong condition and a diagnosis of pedophilia or pedophilic disorder does not necessarily mean a person has "difficulty controlling that aspect of himself." In order to show a person is a sexually violent predator, the diagnosed mental disorder must be current and there should be current, observable evidence of serious difficulty controlling behavior.

Although Fisher gave Orey a score of six on the Static-99R, Fisher did not believe the Static-99R was an accurate assessment tool because it does not take into account a person's growth, maturity, or positive changes made through treatment. Orey had gone through a period from 2009 to 2012 in which he worked diligently in treatment, and had continued to apply those treatment concepts he had learned.

Fisher concluded that Orey would not be likely to reoffend or engage in sexually violent predatory behavior in the future and that he no longer has any interest in molesting a child or fantasies about sex with children. Fisher testified that Orey's release plan was complete, comprehensive, and addressed Orey's treatment needs.

## DISCUSSION

### I.

### Any Error in Admitting the Victim Photographs into Evidence Was Harmless

Orey challenges the commitment order on the ground the trial court denied his motion to exclude, and permitted the People to introduce into evidence, three

photographs: a photograph of El.B. and a photograph of E.B. at age eight (exhibit 72) and a photograph of C.A. at age nine (exhibit 76). The trial court engaged in an analysis under Evidence Code section 352 and concluded that exhibits 72 and 76 were relevant to "whether [Orey] has a diagnosed mental disorder." The district attorney showed Exhibit 72 to the jury during El.B.'s testimony, showed exhibit 76 to the jury during C.A.'s testimony, and referred to both exhibits in closing argument.

Orey argues the photographs of El.B. and C.A. were irrelevant to any issue presented at trial. Exhibits 72 and 76 appear to have had little or no probative value. As Orey points out, he conceded at trial that he had committed the qualifying offenses. His own expert testified that before 2005 he had pedophilic disorder and fetishistic disorder. The victims' identities and ages at the times of the offenses were not in dispute. Orey's knowledge at the time of the offenses that the victims were children was not in dispute. The primary issue at trial was whether it was likely Orey would continue to engage in sexually violent criminal behavior if released from custody.

But any error in admitting exhibits 72 and 76 into evidence was harmless. Error under Evidence Code section 352 is evaluated under the standard of harmless error set forth in *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*). (*People v. Marks* (2003) 31 Cal.4th 197, 227; *People v. Earp* (1999) 20 Cal.4th 826, 878.) Under the *Watson* standard, reversal is required only if "it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*Watson, supra*, 46 Cal.2d at p. 836.) Only two photographs were admitted. The jurors certainly knew already what an eight- or nine-year-old girl looked like and had created a mental image of one without a photograph. As the Attorney General posits, "the admission of the three photographs would be harmless because the jury would just as well have visualized a similar image to the ones shown at trial." It is not reasonably probable the jury would have reached a result more favorable to Orey if exhibits 72 and 76 had not been admitted into evidence.

## II.

### Orey's Prison Records and Coalinga State Hospital
### Records Were Admissible

A. *Background: Admission of Double Hearsay*

Orey contends the trial court erred by permitting the People to introduce into evidence notes made by prison officials between 2002 and 2009 reflecting statements allegedly made about or by Orey (exhibits 16-19, 22, 24), and notes made by Coalinga State Hospital staff and various treatment providers that include statements allegedly made about or by Orey regarding his condition and treatment history (exhibits 32, 34-37, 39-45, 48-49). Orey contends the statements and notes found in the prison records and Coalinga State Hospital records were inadmissible hearsay and the contents of the records were not authenticated. He argues that the People did not offer foundational testimony or other evidence provided by the persons who recorded his statements in order to prove the veracity of the contents of the records.

Hearsay is "evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated." (Evid. Code, § 1200, subd. (a).) Public records and business records often contain double hearsay. Double hearsay is not categorically inadmissible; instead, a double hearsay statement is admissible if each level of hearsay comes within an exception to the hearsay rule. (*People v. Anderson* (2018) 5 Cal.5th 372, 403; *People v. Zapien* (1993) 4 Cal.4th 929, 951-952.) In *People v. Ayers* (2005) 125 Cal.App.4th 988, 995, the appellate court held that a domestic violence organization's records contained double hearsay: The first hearsay layer was the victim's statements to the organization's employee, and the second hearsay layer was the employee's recordation of those statements.

An example of double hearsay in this case would be a prison record in which a prison staff member has recorded (verbatim or in paraphrase) a statement made by Orey to the staff member. The first level of hearsay is the statement made by Orey to

the prison staff member (if Orey's statement were offered for its truth). (Evid. Code, § 1200, subd. (a).) In that situation, the statement's probative value depends on Orey's credibility. (See *People v. Fayed* (2020) 9 Cal.5th 147, 169-170.) The second level of hearsay is the prison staff member's recordation of Orey's statement in the prison record.

The public records exception will satisfy the second level of hearsay; that is, it will obviate the need for the prison staff member to testify about what Orey said or the staff member's impression of or thoughts about Orey. The first level of hearsay (if the statement indeed is hearsay) must come, however, within its own hearsay exception. (See *People v. Ayers, supra*, 125 Cal.App.4th at pp. 994-995; *Hutton v. Brookside Hospital* (1963) 213 Cal.App.2d 350, 355 [the business records exception "does not make admissible that which would be inadmissible if it were presented by oral testimony"].)

We therefore undertake a two-step analysis to determine whether the trial court erred by admitting into evidence statements about or attributed to Orey that were reported in the prison records and the Coalinga State Hospital records. First, we address authentication and the second level of hearsay: whether the prison records and Coalinga State Hospital records were themselves admissible as public records and/or business records. Second, we address the first level of hearsay: Whether specific statements and assertions concerning Orey or attributed to him, if hearsay, came within an exception to the hearsay rule.

B. *Two-step Analysis for Considering Double Hearsay*

1. *Step One—Second Hearsay Level: Authentication, Public Records Exception, Business Records Exception*

"Authentication of a writing is required before it may be received in evidence." (Evid. Code, § 1401, subd. (a); see *Continental Baking Co. v. Katz* (1968) 68 Cal.2d 512, 525 ["Generally speaking, documents must be authenticated in some fashion before they are admissible in evidence."].) "Authentication of a writing means (a) the introduction of evidence sufficient to sustain a finding that it is the writing that the

19

proponent of the evidence claims it is or (b) the establishment of such facts by any other means provided by law." (Evid. Code, § 1400.)

Evidence of a writing made by a public employee is not made inadmissible by the hearsay rule if the writing was made within the scope of the public employee's duty, was made at or near the act, condition or event reflected in the writing, and the sources of information, method, and time of preparation indicate the writing's trustworthiness. (Evid. Code, § 1280.) The requirement of trustworthiness may be established by showing that a written report is based on the observations of a public employee who has a duty to observe the events and to report and record them accurately. (*People v. George* (1994) 30 Cal.App.4th 262, 273-274.) Hospital records, if properly authenticated, are admissible under the business records exception to the hearsay rule. (*Yates, supra*, 25 Cal.App.5th at p. 486; *People v. Landau* (2016) 246 Cal.App.4th 850, 872, fn. 7.) The business records exception is codified at Evidence Code section 1271.[3] "Compliance with a subpoena duces tecum may dispense with the need for a live witness to establish the business records exception if the records are produced by the custodian or other qualified witness, together with the affidavit described in Evidence Code section 1561." (*Yates, supra*, at p. 486.)

Orey's prison records and Coalinga State Hospital records were authenticated and made admissible under the public records exception or the business records exception to the hearsay rule. To authenticate the records and satisfy the foundational requirements of Evidence Code sections 1271 or 1280, the district attorney

---

3 Evidence Code section 1271 states: "Evidence of a writing made as a record of an act, condition, or event is not made inadmissible by the hearsay rule when offered to prove the act, condition, or event if: [¶] (a) The writing was made in the regular course of a business; [¶] (b) The writing was made at or near the time of the act, condition, or event; [¶] (c) The custodian or other qualified witness testifies to its identity and the mode of its preparation; and [¶] (d) The sources of information and method and time of preparation were such as to indicate its trustworthiness."

presented custodian of records declarations from Coalinga State Hospital and the State Department of Corrections and Rehabilitation. These declarations were admitted into evidence as exhibits 6 through 13. During trial, the district attorney filed a "People's Guide to Custodian Declarations" that contained two tables, one matching each exhibit with the authenticating custodian of records declaration, and the other matching each custodian of records declaration with the exhibits it authenticated. According to the Attorney General, exhibits 6 through 13 identified the prison records and Coalinga State Hospital records as properly prepared public records and business records under sections 1271 and 1280.

The trial court found that exhibits 6 through 13 were "adequate to admit" the prison records and the Coalinga State Hospital records under the public records exception and the business records exception. Orey does not challenge that ruling or contend exhibits 6 through 13 were inadmissible or failed to satisfy the foundational requirements of Evidence Code sections 1271 and 1280. The notations on the prison records and the Coalinga State Hospital records were made by public employees having an official duty to accurately record statements during the normal course of business, thereby providing an exception to the second level of hearsay. (*People v. George, supra*, 30 Cal.App.4th at pp. 273-274.) Testimony by each of these public employers was not required because the records had been authenticated as public records or business records. (See *People v. Valdez* (2011) 201 Cal.App.4th 1429, 1434-1435.)

2. *Step Two—First Hearsay Level: Nonhearsay, Party Admission Exception*

We next examine each challenged statement in the records to determine whether the statement was admissible. In so doing it is important consider what is and what is not hearsay. "'When evidence that certain words were spoken or written is admitted to prove that the words were uttered [or written] and not to prove their truth, the evidence is not hearsay.'" (*Hart v. Keenan Properties, Inc.* (2020) 9 Cal.5th 442, 447.) "For example, suppose A hit B after B said, 'You're stupid.' B's out-of-court statement

21

asserts that A is stupid. If those words are offered to prove that A is, indeed, stupid, they constitute hearsay and would be inadmissible unless they fell under a hearsay exception. However, those same words might be admissible for a nonhearsay purpose: to prove that A had a motive to assault B. The distinction turns not on the words themselves, but what they are offered to prove." (*Id.* at pp. 447-448.)

Also relevant to this case is the hearsay exception for statements made by a party opponent (we refer to this as the party admission exception) codified at Evidence Code section 1220. The party admission exception applies as follows: "The evidence was of statements, defendant was the declarant, the statements were offered against him, and he was a party to the action. Accordingly, the hearsay rule does not make the statements inadmissible." (*People v. Carpenter* (1999) 21 Cal.4th 1016, 1049.)

We conclude that all the challenged statements were admissible:

*Exhibit 16.* This is a Department of Corrections and Rehabilitation record called "Condensed Mental Health Assessment & Treatment Setting Transfer." It identifies the inmate as Orey and his interview date as September 18, 2002. Orey challenges a handwritten note on exhibit 16 that he "feels helpless with his problems and unable to get help." The challenged passage, to the extent if reflects the note maker's impressions, comes within the public records exception. The challenged passage, to the extent it reflects a statement made by Orey, comes within the party admission exception. It is clear from the record and the context of the notation that the statement refers to Orey.

*Exhibit 17.* This is a Department of Corrections and Rehabilitation record called "Chronological Interdisciplinary Progress Notes." It identifies Orey as the subject of the notes. Next to the date October 28, 2002 is this handwritten note: "self-referral [¶] . . . [Inmate] reports mixture of dream states and being awake when these occur—scenarios include . . . believing he can fly; dreams of having sex with young children." The quoted passage reports statements made by Orey. These statements come within the party admission exception.

22

*Exhibit 18.*  This is a Department of Corrections and Rehabilitation record called "Chronological Interdisciplinary Progress Notes."  It identifies Orey as the subject of the notes.  Next to the date May 6, 2003 is this handwritten note:  "acknowledges ongoing urges and fantasies i.e.—pedophilic behaviors—states desire to get help."  The quoted passage reports statements made by Orey.  These statements come within the party admission exception.

*Exhibit 19.*  This is a Department of Corrections and Rehabilitation record called "Chronological Interdisciplinary Progress Notes."  It identifies Orey as the subject of the notes.  Next to the date March 24, 2005 is this handwritten note:  "Self-Referral [¶] S—'I'm having anxiety attacks.  My uncle had liver cancer surgery yesterday.' [¶]  Is terrified that he will reoffend.  Is plagued by sexual fantasies of molesting children.  He is terrified of hurting another child.  [¶]  Feels alone & abandoned by his fellows in the Jehova[h's] Witnesses & Celebrate Recovery.  [¶] O. Tearful, genuinely anxious and remorseful ~ his sexual addiction/illness.  Very pessimistic ~ the future.  Feels shunned by the world, an exile.  Feels exhausted or 'too awake.'"  The note is signed by G. Savage, Ph.D., clinical psychologist.  The quoted passage reports both the note maker's impressions and statements made by Orey.  The note maker's impressions come within the public records exception or business records exception.  The statements made by Orey come within the party admission exception.

*Exhibit 22.*  This is a Department of Corrections and Rehabilitation record called "Chronological Interdisciplinary Progress Notes."  It identifies Orey as the subject of the notes.  Next to the date August 9, 2006 is a handwritten note stating, in part: "Inmate reports he has little hope.  He described compulsive pe[do]philia and said they are not going to let him ever live a free life in society."  The quoted passage, to the end of the word "pedophilia," comes within the party admission exception.  The rest of the quoted passage is not hearsay because it would not have been offered for the truth of the statement.

*Exhibit 24*. This is a Department of Corrections and Rehabilitation record called "Chronological Interdisciplinary Progress Notes." It identifies Orey as the subject of the notes and bears a date of March 10, 2009. Handwritten notes state, in part: "[Inmate] gives history of growing up in alcoholic family, he has troubled relationships c̄ his family, was 'heavy into drugs', especially meth, LSD and MJ. He was not treated for ADD as a child, in part, because his mother's involvement c̄ Jehovah's Witnesses. [Inmate] expresses both strong spirituality and pedophilic fantasies c̄ strong impulsivity. . . . No psych meds. M.S.E. alert oriented x3, cooperative, expresses good motivation for treatment but is in [illegible] beds where no privacy to study relevant workbooks s̄ being exposed." The note is signed by A.S. Abrams, M.D., psychiatrist. The quoted passage reports both the note maker's impressions and statements made by Orey. The note maker's impressions come within the public records exception or business records exception. The statements made by Orey come within the party admission exception.

*Exhibit 32*. This a Coalinga State Hospital record called "Interdisciplinary Notes." It identifies Orey as the patient. Next to the date June 21, 2012 are handwritten notes stating: "Team met c̄ Mr. Orey to inform him of his transfer to unit 8, he stated, 'no I'm not going.' He became aggressive and angry 'you do what you have to do.' Mr. Orey is being transferred due to multiple medical complaints which RRV can not [*sic*] provide. Team recommends ICF for increased monitoring/providing medical attention." The quoted passage reports both matters within the note maker's personal knowledge (e.g., the team met with Orey), the note maker's impressions (Orey became "aggressive and angry"), and statements made by Orey. Matters within the note maker's personal knowledge and the note maker's impressions come within the public records exception or business records exception. The statements made by Orey come within the party admission exception or do not constitute hearsay.

*Exhibit 34*.  This a Coalinga State Hospital record called "Interdisciplinary Notes."  It identifies Orey as the patient.  There is an entry for September 14, 2012 at 11:35 a.m. that "Ind was seen coming up front stairway while unit was down in courtyard during fire drill.  His level placed on hold."  The entry is signed by D. Scott.  The notes reflect matters within the note maker's personal knowledge and come within the public records exception or business records exception.

*Exhibit 35*.  This a Coalinga State Hospital record called "Interdisciplinary Notes."  It identifies Orey as the patient.  Next to the date September 14, 2012 are lengthy handwritten notes concerning breaches of protocol and discipline issues.  The notes reflect that Orey wandered off his level while it was on hold during a drill.  When confronted, Orey said, "'As far as I'm concerned I was kidnapped in March 2011 and this is none of your business'" and "'[i]t's too late for you to work with me.'"  When told it would be easier for him to accept the fact he had been committed to the hospital, Orey stated, "'I'm not going to stop trying to get what I need . . . I will continue to do what I want, do my program . . . I owe you nothing.'"  The statements made by Orey either are not hearsay because they were not offered for their truth ("I was kidnapped in March 2011") or come within the party admission exception.

*Exhibit 36*.  This a Coalinga State Hospital record called "Interdisciplinary Notes."  It identifies Orey as the patient.  Next to the date January 29, 2013 are handwritten notes stating, in part:  "Monthly Tx team meeting with team psychologist, R.N., RT, CSN, PT.  Mr. Orey did not attend, although invited.  He has not attended team in many months.  Plan updated per chart review and team member input."  The quoted passage reflects matters within the note maker's personal knowledge and therefore comes within the public records exception or business records exception.

*Exhibit 37*.  This a Coalinga State Hospital record called "Interdisciplinary Notes."  It identifies Orey as the patient.  Next to the date May 6, 2013 at 22:42 is an entry stating, in part:  "At approx. 11[:]15 Patient did not return back to unit for the

25

11[:]30 Actual Count time (unauthorized movement). Patient was located in the mall area participating in a patient protest. Staff members went to the mall area to account for patient and to observe and monitor behavior." The note is signed by Samantha Amaro, PT. The quoted passage reflects matters within the note maker's personal knowledge and comes within the public records exception or business records exception.

*Exhibit 39.* This a Coalinga State Hospital record called "Interdisciplinary Notes." It identifies Orey as the patient. Next to the date April 21, 2014 at 12:44 p.m. is an entry stating, in part: "Patient Participated in a sit down protest located in the Mall area at 11[:]00 count on 4/17/14. Unit 6 and patients are protesting for the removal of a specific staff member from being assigned to the unit." The note is signed by James Walter, nursing coordinator. The quoted passage reflects matters within the note maker's personal knowledge and therefore comes within the public records exception or business records exception.

*Exhibit 40.* This a Coalinga State Hospital record called "Interdisciplinary Notes." It identifies Orey as the patient. Next to the date June 23, 2014 are handwritten notes reporting that Orey had failed to attend a monthly team meeting, was still not enrolled in any groups, and "remains aloof from staff and team." The quoted passage reflects matters within the note maker's personal knowledge, including the note maker's impression of Orey ("remains aloof . . .") and therefore comes within the public records exception or business records exception.

*Exhibit 41.* This a Coalinga State Hospital record called "Interdisciplinary Notes." It identifies Orey as the patient. Next to the date July 23, 2014 are handwritten notes reporting that Orey was found to have possession of a DVD belonging to another patient. Next to the date July 24, 2014 are handwritten notes reporting that Orey had failed to attend a team meeting. The notes reflect matters within the note maker's personal knowledge and therefore come within the public records exception or business records exception.

*Exhibit 42*. This a Coalinga State Hospital record called "Interdisciplinary Notes." It identifies Orey as the patient. Next to the date July 24, 2014 are handwritten notes stating in part: "Mr. Orey remains adamantly opposed to treatment and continues to pursue his claims through legal means. He has not approached CSW for services and usually remains aloof from staff and team." Although the note does not expressly say that Orey made a statement that he was "adamantly opposed to treatment" it is clear from context that the note is reporting that Orey made such statement. Thus, that part of the note comes within the party admission exception. The rest of the note comes within the public records exception or business records exception.

*Exhibit 43*. This a Coalinga State Hospital record called "Interdisciplinary Notes." It identifies Orey as the patient. Next to the dates February 24 and 25, 2016 are notes reporting that Orey removed food from the "PDR" and his level was going to be placed on hold. Next to the date February 26, 2016 are handwritten notes reporting that Orey had stated, "'so I brought food back so now I'm in trouble. I'm a bad guy trying to get by. I understand the need for rules. You have this big expensive hospital but all the people inside are empty. I'm a program failure as far as you guys are concerned. I'm just a person that fills up one of the beds don't ever think you can help me.'" The quoted passage, "'I'm a program failure as far as you guys are concerned'" comes within the party admission exception. The rest of the quoted material is not hearsay because it would not have been offered for the truth of the matter stated. It was not relevant whether or not Coalinga State Hospital was in fact big and expensive, whether or not the people inside are empty, whether or not Orey just filled a bed, and whether or not hospital staff could help him. What was relevant was that Orey had made those statements. The credibility of the note maker in accurately recording what Orey said, and not Orey's credibility in making assertions of fact, is the critical issue.

*Exhibit 44*. This a Coalinga State Hospital record called "Social Work Progress Note." It identifies Orey as the patient. Next to the date August 18, 2016 is an

27

entry reporting an incident in which Orey had asked his social worker to make a phone call to his attorney.  The social worker had asked Orey to complete a form allowing her to do so; Orey returned with a tampered form.  When the social worker asked Orey to properly complete the form, he replied "'I can do whatever I want!'"  The social worker told Orey the phone call would not be made.  He tore the form into pieces and walked away while saying "'he had rights.'"  The note is signed by Jennifer Voss, CSW.  The note reports both matters within the note maker's personal knowledge and statements made by Orey.  The matters within the note maker's personal knowledge come within the public records exception or business records exception.  The statements made by Orey are not hearsay because they would not have been offered for the truth of the matter stated, e.g., that Orey in fact could do whatever he wanted.

*Exhibit 45*.  This a Coalinga State Hospital record called "Interdisciplinary Notes."  It identifies Orey as the patient.  Next to the date January 21, 2017 is a handwritten note stating, in part:  "Patient approached this writer stating 'I want you to put what I'm saying in my chart, all the patients get their medical needs met, do I have to throw chairs and act up because that['s] what works around here and I want a complaint form.'"  The note reports both matters within the note maker's personal knowledge and statements made by Orey.  The matters within the note maker's personal knowledge are come within the public records exception or business records exception.  The statements made by Orey are nonhearsay because they would not have been offered for the truth of the matter stated, e.g., that Orey in fact had to throw chairs and act up to have his medical needs met.

*Exhibit 48*.  This a Coalinga State Hospital record called "Social Work Progress Note."  It identifies Orey as the patient.  Next to the date April 19, 2017 are handwritten notes reporting an incident in which a social worker saw Orey taking headphones from another patient.  When asked what was going on, Orey said the headphones were his and he was taking them back.  The other patient said that Orey had

28

agreed to give him the headphones in exchange for two sodas. When the social worker reminded Orey of the policy against bartering, he replied he did not care about hospital policy and "'I did not ask to be here.'" The note reports both matters within the note maker's personal knowledge and statements made by Orey. The matters within the note maker's personal knowledge come within the public records exception or business records exception. The statement made by Orey that he did not care about hospital rules comes within the party admission exception. Orey's statement that he did not ask to be at the hospital is not hearsay.

*Exhibit 49.* This a Coalinga State Hospital record called "Interdisciplinary Notes." It identifies Orey as the patient. Next to a date in March 2018 (the date is cut off) there is an entry reporting an incident in which Orey was seen in the quiet room looking at a tablet computer. Staff asked to see the tablet to make sure it was not contraband. Orey refused the request and stated, "'I'm standing up for my rights, you need a [search] warrant these are my rights I have not done anything wrong, you are violating my rights and I am going to be the first one to stand up for my rights.'" Orey's person and room were searched and a wireless keyboard and wireless mouse were found. The note reports both matters within the note maker's personal knowledge and statements made by Orey. The matters within the note maker's personal knowledge come within the public records exception or business records exception. The quoted statements made by Orey are not hearsay because they would not have been offered for the truth of the matter stated, e.g., the hospital did in fact need a search warrant and was violating Orey's rights.

C. *Admission of the Prison Records and Hospital Records Did Not Violate Orey's Due Process Rights*

Orey argues that admission of the prison records and Coalinga State Hospital records violated his due process rights because he could not confront and cross-examine the authors of the notes and entries. We conclude otherwise.

In civil proceedings, including proceedings under the SVPA, the right to confront and cross-examine witnesses is found in the due process clauses of the federal and state constitutions. (*People v. Otto* (2001) 26 Cal.4th 200, 214 (*Otto*).) Due process under the SVPA is measured by the standard applicable to civil, not criminal, proceedings (*People v. Fulcher* (2006) 136 Cal.App.4th 41, 55), which means the procedure must comport with fundamental principles of fairness and decency (*Murillo v. Superior Court* (2006) 143 Cal.App.4th 730, 738). More specifically, under the SVPA, "hearsay statements must contain special indicia of reliability to satisfy due process." (*Otto, supra*, at p. 210 [victim's hearsay statement].)

The prison records and the Coalinga State Hospital records bear indicia of reliability sufficient to satisfy due process. The records were public records authenticated by custodian of record declarations. The notes and entries contained in the records were made by public employees in the course their official duties or by medical professionals in their course of assessing and treating Orey. Several statements in the records, such as Orey's refusal to participate in treatment starting in 2012, were corroborated by other evidence. The trial court had the discretion to exclude unreliable hearsay under Evidence Code section 352, "which acted as a further safeguard against any due process violation." (*Otto, supra*, 26 Cal.4th at p. 214.) Orey had the opportunity to present his own experts and to cross-examine the People's experts. (*Ibid.*)

In addition, the Civil Discovery Act applies to SVPA proceedings. (*People v. Landau* (2013) 214 Cal.App.4th 1, 25 (*Landau*).) Orey therefore could have exercised his right to confront and cross-examine witnesses by deposing the authors of the notes and entries in the prison records and Coalinga State Hospital Records and, if necessary and permitted, using the deposition transcripts at trial. (*People v. Fulcher, supra*, 136 Cal.App.4th at p. 56; *People v. Angulo* (2005) 129 Cal.App.4th 1349, 1368; see Code Civ. Proc., §§ 2025.010, 2025.620.) Other forms of discovery could have been used to learn an author's name if it were illegible or not disclosed in the record.

30

D. *Admission of the Prison Records and Coalinga State Hospital Records Did Not Violate Evidence Code Section 352*

Orey argues the admission of the prison records and Coalinga State Hospital records violated Evidence Code section 352.  We disagree.

Evidence Code section 352 grants the trial court discretion to exclude relevant evidence if "its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."  (Evid. Code, § 352.)  The prejudice referred to in section 352 means the evidence tends to evoke an emotional bias against the defendant as an individual and has little effect on the issues.  (*People v. Rucker* (2005) 126 Cal.App.4th 1107, 1119.)

The prison records and Coalinga State Hospital records were highly probative of the issues at trial, in particular, whether after 2005 there was a substantial risk that Orey would engage in sexually violent criminal behavior.  Nothing in the appellate record suggests that admission of Orey's records used up an undue amount of time.  The information in the records was not more inflammatory than other evidence of Orey's behavior and therefore would not have evoked an emotional bias against Orey.  In addition, Orey requested redactions in the records and his requests were granted.  The information in the records was so closely aligned with the issues at trial that there was little if any chance they would have confused or misled the jury.

### III.

### Substantial Evidence Supports the Order of Commitment

Orey argues substantial evidence does not support a finding that he qualified for commitment as a sexually violent predator pursuant to the SVPA.  The appellate court reviews the sufficiency of the evidence in SVPA cases under the same substantial evidence test used in criminal appeals.  (*People v. McCloud* (2013) 213 Cal.App.4th 1076, 1088 (*McCloud*).)  "In assessing the sufficiency of the evidence, we

31

review the entire record in the light most favorable to the judgment to determine whether it discloses evidence that is reasonable, credible, and of solid value such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)  Reversal for insufficiency of the evidence is warranted only if it appears that "'upon no hypothesis whatever is there sufficient substantial evidence to support [the judgment].'" (*Ibid.*)

To establish that Orey is a sexually violent predator, the People had the burden of proving (1) Orey had been convicted of at least one qualifying sexually violent offense, (2) he has a diagnosed mental disorder that makes him a danger to the health and safety of others, and (3) his diagnosed mental disorder makes it likely he will engage in sexually violent criminal behavior in the future.  Orey does not challenge the sufficiency of the evidence supporting element one and the sufficiency of the evidence supporting a finding that he once had the requisite diagnosed medical disorder.  He argues the evidence was insufficient to show that, at the time of trial, his diagnosed medical disorders made him a danger to the health and safety of others and made it likely he would engage in future acts of sexually violent behavior.  Orey contends the evaluations prepared by Patterson and Malhotra and their testimony do not constitute substantial evidence on those issues because their opinions were not supported by evidence of actual current and future threat of sexually violent behavior.  Instead, Orey argues, their testimony and evaluations were based solely on their belief that because he had qualified as a sexually violent predator between 1995 and 2005, he remains one today.

Based on the evidence presented at trial, a rational jury could have found that Orey was, as of that time, a sexually violent predator under the SVPA.  (*Jackson v. Virginia* (1979) 443 U.S. 307, 318-319; *People v. Johnson* (1980) 26 Cal.3d 557, 576.)  Both Patterson and Malhotra concluded that Orey suffered from pedophilic disorder, fetishistic disorder, and various substance abuse disorders.  Patterson interviewed Orey in 2011 and concluded Orey was a sexually violent predator at that time.  In the 2011

32

interview, Orey said his sexual fantasies about prepubescent children were "ongoing," he preferred girls under the age of 10, he liked to masturbate with girls underwear, and he would benefit from treatment. Patterson prepared evaluations of Orey in 2011, 2013, 2016, 2017, and 2018. In each evaluation, and in testifying at trial, Patterson reached the same conclusion: Orey was, and continued to be, a sexually violent predator. Malhotra prepared an evaluation of Orey in 2018 and, in that evaluation and in testifying at trial, likewise reached the conclusion that Orey was a sexually violent predator.

Patterson testified that pedophilic disorder tends to be a lifelong condition, and Malhotra testified that pedophilia is generally thought to be lifelong. The jury was entitled to accept this testimony and reject Abbott's and Fisher's testimony to the contrary. (*People v. Carter* (1961) 56 Cal.2d 549, 560 ["it was for the jury to resolve the conflicts in the expert testimony, accepting such of it, or none of it, as they saw fit"]; *People v. Mercer* (1999) 70 Cal.App.4th 463, 466 [credibility of experts and their conclusions is for trier of fact to resolve].)

Patterson and Malhotra based their conclusions that Orey likely would engage in future acts of sexually violent criminal behavior on several factors, not just the chronic nature of pedophilic disorder or pedophilia. First, his scores on the Static-99R and Static-2002 at the time of trial placed Orey in the highest risk group of offenders, and Orey's score on the SORAG and VRAG placed him in the moderately high-risk group. Patterson determined that Orey had no "protective factors" (such as advanced age) that might reduce the level of risk; Malhotra found that Orey has all five dynamic risk factors found to have significant value in predicting risk.

Second, both Patterson and Malhotra considered the prison records and Coalinga State Hospital records, which we have concluded were properly admitted into evidence, in reaching their conclusions.[4] Prison records show that in August 2006 Orey

---

[4] Patterson and Malhotra were permitted to rely on, and testify to the contents of, the prison records and the Coalinga State Hospital records because those records, and Orey's

reported having compulsive pedophilia and in March 2009 he reported having pedophilic fantasies. The Coalinga State Hospital records show that from June 21, 2012 (the date of the note on exhibit 32) to March 2018 (the date of the note on exhibit 49) Orey engaged in several acts of unruly and aggressive behavior, violated hospital rules, would not accept the fact of being committed, and did not attend team meetings. Patterson considered Orey's poor performance while under supervision at Coalinga State Hospital and concluded that Orey has "demonstrated that he has not been able to manage his behavior . . . despite treatment and despite punishment."

The most significant fact gleaned from the Coalinga State Hospital records is that Orey refused treatment and considered himself "'a program failure.'" Malhotra described Orey as "generally anti-treatment." Although Orey had told Patterson in 2011 that he would participate in treatment, he declined treatment after 2012. The parties stipulated that Orey declined further treatment starting in 2012, and Coalinga State Hospital records confirm the veracity of this stipulation. An SVPA defendant's refusal to participate in any phase of treatment supports a finding that the defendant would not be able to control his dangerous behavior by voluntary means if released into the community. (*People v. Superior Court (Ghilotti)* (2002) 27 Cal.4th 888, 929; *People v. Sumahit* (2005) 128 Cal.App.4th 347, 354-355 (*Sumahit*).)

It is also significant that Orey refused to meet with Patterson after 2011 and declined to come to the telephone to speak with Malhotra, but did allow himself to be interviewed by Fisher in 2019. "[W]e cannot overlook the significance of defendant's refusal to be interviewed by either of the state's experts. The law has a strong interest in seeing to it that litigants do not manipulate the system, especially where to hold otherwise would permit them to '"trifle with the courts."'" [Citations.] Here, defendant fully cooperated with his own psychologist, while denying the People's doctors the

statements reflected in them, had been properly received in evidence. (*People v. Sanchez* (2016) 63 Cal.4th 665, 686; *People v. Burroughs* (2016) 6 Cal.App.5th 378, 407.)

34

opportunity to interview him . . . . A sex offender cannot deny the state access to the workings of his mind and then claim a lack of proof that he has a 'current' psychological disorder. Because he refused to be interviewed by the state's experts, who could have formed an opinion as to his present dangerousness, defendant has forfeited the claim that the state did not prove that he was currently dangerous." (*Sumahit, supra*, 128 Cal.App.4th at pp. 353-354, fn. omitted.) Although we decline to find that Orey completely forfeited his contention that the People had failed to prove he is currently dangerous, Orey's refusal to meet with Patterson and Malhotra constitutes evidence that Orey remained a sexually violent predator at the time of trial.

Orey argues the Coalinga State Hospital records "included nothing that would suggest he was currently acting out" his pedophilic and fetishistic desires, and points out that Malhotra "conceded that there were no outward manifestations of [Orey]'s disorders while he ha[s] been confined at [Coalinga State Hospital]." That is to be expected: "The fact that defendant has not misbehaved in a strictly controlled hospital environment does not prove he no longer suffers from a mental disorder that poses a danger to others. Defendant has an abnormal attraction to female children. Because he currently lacks access to children, his lack of outward signs of sexual deviance is not dispositive of whether he is likely to reoffend if released into society at large. Such an assessment must include consideration of his past behavior, his attitude toward treatment and other risk factors applicable to the facts of his case." (*Sumahit, supra*, 128 Cal.App.4th at p. 353.)

## IV.

### Denial of Orey's *Marsden* Motions Was Not Erroneous

A. *The* Marsden *Motions and Hearings*

On three or four occasions before trial commenced, Orey moved, under *Marsden, supra*, 2 Cal.3d at page 118, for the discharge of his appointed counsel and for

appointment of other counsel to represent him.  We refer to these as *Marsden* motions.
He argues the trial court erred by denying these motions, both individually and
collectively.

> 1.  *First* Marsden *Motion, October 19, 2018*

Orey's first Marsden motion was heard before Judge Prickett on October
19, 2018.  Orey was represented by Denise Crawford of the office of the Orange County
Public Defender.  She represented Orey through trial.

Orey stated he was not asking for substitution of counsel, but removal of
the entire public defender's office, as well as the district attorney and the judge.  He
objected to any substitute counsel who would not file a motion to dismiss the SVPA
petition pursuant to *People v. Superior Court (Vasquez)* (2018) 27 Cal.App.5th 36
(*Vasquez*)[5] and *People v. Litmon* (2008) 162 Cal.App.4th 383 (*Litmon*).[6]  Orey argued

---

[5]  In *Vasquez*, a person was detained in state hospitals for over 17 years while awaiting
a trial on an SVPA commitment petition.  (*Vasquez, supra*, 27 Cal.App.5th at p. 40.)
After 16 years, the trial court granted the detainee's motion to relieve the public
defender's office as counsel and appointed a bar panel attorney to represent him.  (*Id.* at
p. 41.)  Eight months later, the detainee's new counsel filed a motion to dismiss the
SVPA petition for violation of the detainee's due process right to a speedy trial.  (*Ibid.*)

The trial court granted the motion, and the Court of Appeal upheld the dismissal.
(*Vasquez, supra,* 27 Cal.App.5th at p. 41.)  The appellate court concluded that although a
substantial portion of the delay resulted from the failure of individual appointed attorneys
to move the case forward, "the extraordinary length of the delay resulted from 'a
systemic "breakdown in the public defender system,"' and must be attributed the state."
(*Ibid.*)  The detainee had never objected to the many continuances of the trial date but had
told his attorney he wanted to go to trial.  (*Id.* at p. 62.)  Although the extreme length of
the delay in bringing the SVPA petition to trial (17 years) was not dispositive, it was
significant that dramatic staffing cuts in the public defender's office was a cause of a
substantial amount of the delay.  (*Id.* at pp. 69, 77.)  In addition, "the trial court failed
Vasquez" by not considering whether to remove the public defender's office.  (*Id.* at
p. 77.)

[6]  In *Litmon*, the detained person was found by a jury to be a sexually violent predatory
and was committed for a two-year period.  (*Litmon, supra*, 162 Cal.App.4th at p. 390.)
Several recommitment petitions were filed well-past the end of the two-year commitment

---

that he had "sat at the hospital there at Coalinga State Hospital for eight years without a trial," the only reason why the matter was proceeding was *Vasquez*, and had *Vasquez* not been issued, "I would still be sitting at Coalinga." Orey claimed his due process right to "a timely trial" had been violated, his counsel was not prepared for trial and had failed to give him his case records, and the due process violations were being covered up by "rushing me into trial unprepared."

Crawford explained that she had tried to bring Orey his records but that he had not appeared for the visit. Crawford stated she believed she would be prepared for trial in January 2019 and would need at least 20 hours of consulting with Orey to prepare. Crawford stated she did not intend to bring a speedy trial (*Vasquez*) motion. Orey stated that waiting eight years for trial was "ridiculous" and counsel's refusal to bring a speedy trial motion created a conflict of interest.

Judge Prickett confirmed that Crawford would be able to prepare for trial by speaking with Orey by telephone and that Orey would take her telephone calls. Judge Prickett denied the *Marsden* motion.

---

period and a two-year recommitment period. (*Id.* at pp. 390-391.) The recommitment petitions were consolidated for trial. (*Id.* at p. 391.) At a hearing conducted nearly two years after the end of the recommitment period, the detainee's counsel told the court the detainee did not want to delay the case and requested a trial be set for the following week. (*Id.* at p. 392.) The trial court continued the matter for eight months because the district attorney had scheduling conflicts and wanted to get updated evaluations. (*Ibid.*)

The detainee filed a motion to dismiss the petition based on a violation of his due process rights. (*Litmon, supra*, 162 Cal.App.4th at p. 392.) After the trial court denied that motion, and just before the trial date, the district attorney moved to continue the trial for two more months because he had learned his witnesses were scheduled to testify in other cases. The trial court denied the motion to dismiss and granted the requested continuance. (*Id.* at p. 394.) The Court of Appeal reversed. Although the eight-month continuance appeared to comport with due process, the two-month continuance could not be reconciled with due process given the detainee's "complete loss of liberty" while awaiting trial. (*Id.* at p. 404-406.)

### 2. *Second* Marsden *Motion*, *January 17, 2019*

Orey's second *Marsden* motion was heard on January 17, 2019 before Judge Makino. Orey made the claim that his counsel, Crawford, had divulged information about his case to other patients at Coalinga State Hospital. Orey said that a patient named Rick Kelly had talked in front of other patients and staff about Orey's case and had posted information on a website. According to Orey, Kelly had spoken with Crawford by telephone.

Orey again argued that his counsel's refusal to bring a motion to dismiss pursuant to *Vasquez* and *Litmon* created a conflict of interest. He claimed his case was being delayed over his objection and asserted that counsel would be lying if she claimed otherwise. He also complained that he had had "eight separate attorneys" and that attorneys simply "dropped off the map" without notifying him. Orey claimed that Crawford had told him she would not file a *Vasquez* motion because "that would require her to indicate that her coworkers didn't do their job and she couldn't do that," Crawford had ignored his "liberty interest in getting out of here," Coalinga State Hospital had falsified his records and Crawford had done nothing about it, and Crawford should have sought to disqualify Malhotra as an evaluator.

Judge Makino asked Crawford whether Orey had objected to any trial continuances. She replied that, since the hearing on the first *Marsden* motion, there had been one trial setting. Orey was not present at the trial setting because at the hearing on the first *Marsden* motion he had requested to be returned to Coalinga State Hospital and not to be transported to Orange County for the next hearing.

Judge Makino denied Orey's second *Marsden* motion on the ground there had been no showing that counsel's performance was deficient.

### 3. *Written* Marsden *Motion*, *February 11, 2019*

Orey submitted a written *Marsden* motion dated February 11, 2019. He claimed a new conflict of interest with the public defender's office had arisen because he

had given notice to the public defender "and his subordinates" that "he is and will sue them for professional negligence in the[ir] handling and moving the case forward." In a notice of intent to sue, directed to the public defender, Orey wrote: "Your office has had my case for 8 years. Your policies of rotating attorneys, unavailable expert funds and other issues brought up in the recent Marsden motions I have filed demonstrate this claim."

### 4. *Fourth* Marsden *Motion, March 1, 2019*

A hearing on Orey's *Marsden* motion was conducted on March 1, 2019 by Judge Pham. (Whether this was a hearing on Orey's written *Marsden* motion or a fourth *Marsden* motion is not clear from the record.) Orey said he had a letter informing the court that he intended to sue the public defender's office on the ground his right to a timely trial had been violated as he awaited trial for the past eight years. He claimed to have had a "series of attorneys" and to have never been told why his attorneys were "rotating out."

Crawford stated that Orey had made the same claim in his prior *Marsden* motions and explained why Orey had had several attorneys represent him and the reasons for the delay in getting to trial. Orey's first attorney was involved in representing him in a motion to dismiss the SVPA petition and subsequent petition for writ of mandate proceeding that culminated in a published opinion, *Orey v. Superior Court* (2013) 213 Cal.App.4th 1241. Orey had been informed of and had agreed to each step of the motion to dismiss and writ of mandate proceedings. Orey's next attorney had discussed many times with Orey the status of the case and ability to go to trial. Counsel was preparing the case for trial, but Orey did not want to go to trial and stopped communicating with counsel, refused her visits, and would not cooperate in trial preparation. Crawford stated, "the issue that arose from my review of the file was Mr. Orey's adamant desire not to go to trial." When that counsel retired, Crawford replaced her on the case.

39

When Crawford first started work on the case, she asked Orey if he wanted to go to trial. He told her he did not want to go to trial and had been frustrated with prior counsel because she had pushed him to go to trial. Orey also was suffering back pain that was so severe he did not even want to discuss trial. Crawford eventually told Orey that it was necessary to prepare for trial. There were times when Orey did not want to communicate with Crawford, but they were able to continue the attorney-client relationship, he still worked with her, and trial preparation was going well.

Judge Pham asked Orey if he had told his counsel that he did not want to go to trial. Orey responded by saying, "I've always said from the beginning that the stance should be the abuse of the law and the abuse of the science and not trial" and "trial was not the answer." He claimed that a motion or writ petition challenging the legal and scientific soundness of the SVPA itself ("against the abuse of the law or the abuse of the science") was "the way to go." He argued, based on *Vasquez*, that the entire public defender's office should be disqualified from representing him.

Judge Pham stated that Orey had provided no reason to relieve Crawford from representing him and that doing so would be detrimental to him because it would cause another delay in starting trial. In response, Orey said he was not troubled by trial delay because, he claimed, under *Vasquez* the appropriate relief for violation of his due process rights was dismissal, not trial. Judge Pham denied the *Marsden* motion.

B. *Background Law*

An indigent person subject to a commitment petition under the SVPA has a statutory right to the appointment of counsel. (§ 6603, subd. (a).) Although the Sixth Amendment right to counsel does not apply to such civil commitment proceedings, a defendant has a due process right to the effective assistance of counsel, and thus the right to make *Marsden* motions to discharge his or her appointed counsel. (*People v. Hill* (2013) 219 Cal.App.4th 646, 652.)

40

"'A defendant is entitled to have appointed counsel discharged upon a showing that counsel is not providing adequate representation or that counsel and defendant have become embroiled in such an irreconcilable conflict that ineffective representation is likely to result.'" (*People v. Panah* (2005) 35 Cal.4th 395, 431.) We review the trial court's denial of defendant's *Marsden* motion under the abuse of discretion standard. (*Ibid*.) Denial of a *Marsden* motion is not abuse of discretion unless the defendant has shown that a failure to replace the appointed attorney would substantially impair the defendant's right to assistance of counsel. (*People v. Hart* (1999) 20 Cal.4th 546, 603.)

"'[A] *Marsden* hearing is not a full-blown adversarial proceeding, but an informal hearing in which the court ascertains the nature of the defendant's allegations regarding the defects in counsel's representation and decides whether the allegations have sufficient substance to warrant counsel's replacement.'" (*People v. Alfaro* 2007) 41 Cal.4th 1277, 1320.) A *Marsden* hearing provides the defendant a confidential forum in which to present complaints about counsel's performance (*Marsden, supra*, 2 Cal.3d at p. 126) and provides appointed counsel the opportunity to address the defendant's concerns and to explain counsel's performance (*People v. Horton* (1995) 11 Cal.4th 1068, 1123). Although the trial court must afford the defendant the opportunity to express specific reasons why he believes he is not being adequately represented, the court is not required to accept defendant's assertions of inadequate representation. (*People v. Vera* (2004) 122 Cal.App.4th 970, 979-980.)

C. *Orey Failed to Show Inadequate Representation or an Irreconcilable Conflict*

Orey argues that Crawford, and the entire public defender's office, provided inadequate representation, and that he and counsel had become embroiled in an irreconcilable conflict, in three respects: (1) counsel had refused to file a motion to dismiss the SVPA petition pursuant to *Vasquez* and *Litmon*; (2) he had provided notice of his intent to sue the public defender for the failure to bring a motion to dismiss; and

(3) counsel had broken confidentiality, was not "attending to the violation of his rights at [Coalinga State Hospital]," was not allowing him to attend hearings, and "was not operating in his best interest."

As to Orey's first point, counsel's decision not to file a motion to dismiss the SVPA petition pursuant to *Vasquez* and *Litmon* was essentially a tactical decision, and "'[t]actical disagreements between the defendant and his attorney do not by themselves constitute an 'irreconcilable conflict.'" (*People v. Welch* (1999) 20 Cal.4th 701, 728-729.) "A defendant does not have the right to present a defense of his own choosing, but merely the right to an adequate and competent defense." (*Ibid.*) "When a defendant chooses to be represented by professional counsel, that counsel is 'captain of the ship' and can make all but a few fundamental decisions for the defendant." (*People v. Carpenter* (1997) 15 Cal. 4th 312, 376.)

Whether a motion to dismiss the SVPA petition pursuant to *Vasquez* and *Litmon* would or would not have been successful is not an issue we need decide. It is sufficient that Crawford's explanation for the tactical decision not to file such a motion demonstrated that Orey was receiving adequate representation and that no irreconcilable conflict had arisen. At the hearing on March 1, 2019, Crawford related the history of the case and explained why neither she nor Orey's prior counsel had not brought a motion to dismiss the SVPA petition. Of the eight years that had elapsed since that petition was filed, two full years had been spent pursuing the motion to dismiss and petition for writ of mandate proceedings that had culminated in *Orey v. Superior Court, supra*, 213 Cal.App.4th 1241, an opinion filed on February 19, 2013. On our own motion, we take judicial notice of the fact that Orey filed a petition for review of that opinion, the Supreme Court denied the petition, and remittitur was issued on May 23, 2013. (Evid. Code, §§ 452, subd. (d), 452.5, subd. (a), 459, subd. (a).)

Crawford explained that three attorneys from the public defender's office, not eight as Orey claimed, had been primarily responsible for representing Orey. The

42

first attorney represented him through the writ of mandate proceedings. The second appointed attorney was preparing the case for trial but her relationship with Orey broke down because he did not want to go to trial, stopped communicating with counsel, and would not cooperate in trial preparation. When Crawford took over the case, Orey confirmed his desire not to go to trial. At the March 1, 2019 hearing, Orey expressed his desire not to go to trial because "trial was not the answer." Counsel's explanation supports a finding that any delay in bringing the SVPA petition to trial was not the result of "'a systemic "breakdown in the public defender system"'" (*Vasquez, supra,* 27 Cal.App.5th at p. 41) or any dereliction of duty by the trial court (*id*. at p. 77). If there were any conflict in credibility between Crawford and Orey, the trial court was entitled to accept Crawford's explanation. (*People v. Smith* (1993) 6 Cal.4th 684, 696.)

Other distinctions between Orey's case and *Vasquez* and *Litmon* further demonstrate that Orey received adequate representation. Although the length of delay is not dispositive, it is significant that the delay in *Vasquez* was 17 years, over twice the eight-year period of time between the filing of the SVPA petition against Orey and the trial. (See *Vasquez, supra*, 27 Cal.App.5th at p. 40.) In *Litmon*, the Court of Appeal's decision was based on a two-month continuance that was granted solely to accommodate the People's witness and after the detainee had brought a motion to dismiss the SVPA petition based on a violation of his due process rights. (*Litmon, supra*, 162 Cal.App.4th at pp. 404-406.) No such continuances were sought or granted in Orey's case.

As to Orey's second point, Orey's notice of intent to sue the public defender's office did not ipso facto create a conflict of interest justifying appointment of new counsel. It was within the trial court's discretion to determine whether Orey's threat was serious and justified, or simply an attempt to "manufacture a possible conflict of interest." (*People v. Hardy* (1992) 2 Cal.4th 86, 138; see *People v. Horton, supra*, 11 Cal.4th at p. 1106 [trial court has discretion to determine whether the filing of a malpractice lawsuit against appointed counsel created an actual conflict of interest

43

requiring withdrawal of appointed counsel]; *People v. Smith, supra*, 6 Cal.4th 684, 696 ["a defendant may not force the substitution of counsel by his own conduct that manufactures a conflict"].)

As to Orey's third point, the trial court was not required to accept Orey's assertion that counsel had divulged confidences, was not looking into alleged violations of his rights at Coalinga State Hospital, and was not permitting him to attend hearings. These asserted transgressions, even if true or believed by Orey to be true, did not cause an irreconcilable breakdown in the relationship between him and Crawford. At the March 1, 2019 hearing, Orey said he would allow Crawford to continue representing him if she were to "quit her job at the Public Defender's office and start her own private practice." Crawford said she would be able to continue the attorney-client relationship, she and Orey had discussed trial preparation, which was going well, and Orey was "cooperative and helpful" during their meetings.

In sum, Orey failed in each of *Marsden* motions to show his appointed counsel was not providing adequate representation or he and counsel had become embroiled in an irreconcilable conflict that likely would result in ineffective representation. The trial court did not err by denying the motions.

## V.

### The Trial Court Did Not Err by Denying Orey's Request for a Special Instruction

CALCRIM No. 3454 is the standard jury instruction on the elements the People must prove beyond a reasonable doubt in order to prove the person subject to an SVPA commitment petition is a sexually violent predator. CALCRIM No. 3454 includes definitions of the terms "diagnosed mental disorder"[7] and "likely to engage in sexually

---

[7] "The term *diagnosed mental disorder* includes conditions either existing at birth or acquired after birth that affect a person's ability to control emotions and behavior and predispose that person to commit criminal sexual acts to an extent that makes him or her a menace to the health and safety of others." (CALCRIM No. 3454.)

violent predatory criminal behavior."[8]  Orey's trial counsel requested the trial court to give a special instruction on the topics of "volitional impairment" and "serious difficulty controlling sexually violent behavior."  The trial court denied the request on the grounds that CALCRIM No. 3454 had been "approved and was upheld" and that the instruction's definition of diagnosed mental disorder covered the topics on which Orey had requested a special instruction.

The appellate record does not include a proposed instruction or recite the language requested by Orey.  We granted Orey's requested to augment the appellate record with the proposed instruction, but the superior court clerk submitted an affidavit stating a special jury instruction had not been filed.  A trial court does not err by refusing to give proposed instructions not presented in writing before closing arguments begin. (*People v. Ramos* (1997) 15 Cal.4th 1133, 1180-1181.)

In any case, the trial court did not err by declining to instruct the jury on issues of "volitional impairment" and "serious difficulty controlling sexually violent behavior."  In *People v. Williams* (2010) 31 Cal.4th 757, 774-776 (*Williams*), the SVPA defendant challenged his commitment under the SVPA on the ground the jury was not given a special instruction on the need to find serious difficulty in controlling behavior. (*Williams, supra*, at pp. 759-760.)  The Supreme Court held that specific instructions on impairment of control are not constitutionally required in California.  (*Id*. at pp. 776–777.)  The court reasoned the language of the SVPA "inherently encompasses and conveys to a fact finder the requirement of a mental disorder that causes serious difficulty in controlling one's criminal sexual behavior."  (*Williams, supra*, at p. 759.)

Thus, a standard jury instruction based on the SVPA's language, such as CALCRIM No. 3454, is sufficient.  (*Williams, supra*, 31 Cal.4th at p. 759; see *People v.*

---

  8  "A person is *likely to engage in sexually violent predatory criminal behavior* if there is a substantial danger, that is, a serious and well-founded risk that the person will engage in such conduct if released into the community."  (CALCRIM No. 3454.)

*Field* (2016) 1 Cal.App.5th 174, 182-184 (*Field*) [following *Williams* and rejecting claims of error based on failure to provide a pinpoint instruction stating that defendant's mental diagnosis must cause him serious difficulty in controlling his behavior]; *People v. Paniagua* (2012) 209 Cal.App.4th 499, 527-529 [rejecting claim of error based on trial court's refusal to give instruction that defendant must have an inability to control his sexually predatory behavior].)  It was sufficient here for the trial court to instruct the jury with CALCRIM No. 3454 without special or pinpoint instructions on volitional impairment and difficulty controlling sexually violent behavior.

## VI.

### Commitment under the SVPA Does Not Violate Federal or State Constitutional Protections

Orey contends his commitment under the SVPA violates equal protection, due process, the prohibition on ex post facto laws, and double jeopardy.  He makes these claims to preserve them for further state or federal review.

The SVPA does not violate equal protection under the federal constitution or state constitution.  (*Field, supra*, 1 Cal.App.5th at pp. 190-192; *People v. McDonald* (2013) 214 Cal.App.4th 1367, 1377 (*McDonald*); *Landau, supra,* 214 Cal.App.4th at p. 48; *McCloud, supra*, 213 Cal.App.4th at pp. 1085-1086; *People v. McKnight* (2012) 212 Cal.App.4th 860, 863-864; *People v. McKee* (2012) 207 Cal.App.4th 1325, 1347-1348.)  The SVPA does not violate the due process clause or the ex post facto clause of either the federal constitution or the state constitution.  (*People v. McKee* (2010) 47 Cal.4th 1172, 1193, 1195; *McDonald, supra*, at p. 1382; *Landau*, *supra*, at p. 44; *McCloud, supra*, at p. 1085.)  Commitment under the SVPA does not constitute double jeopardy.  (*Field, supra*, 1 Cal.App.5th at pp. 189-190; *McDonald*, *supra*, 214 Cal.App.4th at p. 1383; *Landau, supra*, at pp. 44-45.)

## VII.

### There Is No Cumulative Error

Orey argues cumulative error. The only error we have found was the admission into evidence of exhibits 72 and 76, and that error was harmless. Because there was no other error, there was no cumulative error.

### DISPOSITION

The order of commitment is affirmed.


FYBEL, J.

WE CONCUR:


BEDSWORTH, ACTING P. J.


ARONSON, J.

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G058040 |
| v. | (Super. Ct. No. M-13340) |
| TRAMPAS MICHAEL OREY, | O R D E R |
| Defendant and Appellant. | |

The Office of the District Attorney of San Bernardino County has filed a request that our opinion, filed on March 30, 2021, be certified for publication. It appears that our opinion meets the standards set forth in California Rules of Court, rule 8.1105(c)(2), (3) and (6). The request for publication is GRANTED. The opinion is ordered published in the Official Reports. Respondent's request for partial publication is DENIED as moot.

FYBEL, J.

WE CONCUR:


BEDSWORTH, ACTING P. J.


ARONSON, J.